# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| DAVID RUSSELL,<br><br>      Plaintiff,<br><br>   v.<br><br>CS CONTRACT SOLUTIONS, LLC d/b/a/ CONEXA TECHNOLOGIES, FRONTIER COMMUNICATIONS PARENT, INC., BENJAMIN SUNDERLAND, and KEITH CRISTOBAL, in their individual and professional capacities and d/b/a DRIVE MANAGEMENT GROUP,<br><br>      Defendants. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Russell ("Russell" or "Plaintiff"), by and through his attorneys, Crabill PLLC, hereby alleges as follows against Defendants CS Contract Solutions, LLC ("CS") d/b/a Conexa Technologies ("Conexa"), Frontier Communications Parent, Inc. ("Frontier"), Benjamin Sunderland ("Sunderland"), and Keith Cristobal ("Cristobal") (Sunderland and Cristobal together d/b/a/ Drive Management Group ("DMG")) (altogether, "Defendants"):

## PRELIMINARY STATEMENT

1.      Defendants turned their back on Russell, a hardworking and dedicated Technician, when they callously and unlawfully rescinded a reasonable accommodation related to his Type 2 diabetes.

2.      For nearly a year, Russell excelled working with an accommodation which allowed him to have two consecutive days off from work each week to manage the symptoms resulting from his diabetes.

3.      As part of an effort to convince Technicians to work six days per weeks so that Defendants could pad their bottom lines, Defendants ripped away Russell's accommodation without any explanation and without engaging in any legitimate interactive process to discover a different accommodation that would allow Russell to do his job.

4.      Defendants' deplorable treatment of Russell demonstrates that they put profits over the health and safety of their employees.

5.      The discrimination and retaliation that Defendants committed against Connolly violates, *inter alia*, the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.* ("ADA") and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA").

## JURISDICTION AND VENUE

6.    Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the ADA.

7.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State law.

8.    Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

9.    On October 9, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of ADA.

10.    Plaintiff received a Notice of Right to Sue from the EEOC on October 17, 2024.

11.    Fewer than 90 days have passed since Plaintiff received his Notice of Right to Sue.

## PARTIES

A.    **Plaintiff David Russell**

12.    Russell is a resident of the State of Florida.

13.    Russell was employed by Conexa from in or around 2020 through on or around April 5, 2024.

14.    Russell was employed by DMG from in or around September 2022 through on or around April 5, 2024.

15.    Russell was employed by Frontier from in or around February 2023 through on or around April 5, 2024.

16.    At all relevant times, Russell was an "employee" of Conexa, DMG, and Frontier within the meaning of all relevant statutes and regulations.

**B.    Defendant CS Contract Solutions, LLC d/b/a Conexa Technologies**

17.    Defendant CS Contract Solutions is a domestic business corporation that provides telecommunications services including project-based staffing solutions for both outside and inside plant projects in Florida and across the country.

18.    Upon information and belief, in or around 2023, CS rebranded and started conducting business under the trade name Conexa Technologies.

19.    At all relevant times, Conexa controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

20.    At all relevant times, Conexa established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

21.    At all relevant times, Conexa maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

22.    At all relevant times, Russell was an "employee" within the meaning of all relevant statutes and regulations.

## C.    **Defendant Benjamin Sunderland**

23.    Sunderland is an owner of Conexa and a resident of Vermont.

24.    On or around September 2, 2022, Sunderland, in addition to being an owner of Conexa, began doing business under the trade name Drive Management Group.

25.    At all relevant times, Sunderland controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

26.    At all relevant times, Sunderland established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

27.    At all relevant times, Sunderland maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

28.    At all relevant times, Sunderland was an "employer" within the meaning of all relevant statutes and regulations.

D.    **Defendant Keith Cristobal**

29.    Cristobal is an owner of Conexa and is a resident of New Hampshire.

30.    On or around September 2, 2022, Cristobal, in addition to being an owner of Conexa, began doing business under the trade name Drive Management Group.

31.    At all relevant times, Cristobal controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

32.    At all relevant times, Cristobal established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

33.    At all relevant times, Cristobal maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

34.    At all relevant times, Cristobal was an "employer" within the meaning of all relevant statutes and regulations.

E.    **Defendant Frontier Communications Parent, Inc.**

35.    Frontier is a domestic telecommunications business corporation that regularly provides broadband, voice, and television services to residential and business customers in Florida and across the country.

6

36.    At all relevant times, Frontier controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

37.    At all relevant times, Frontier established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

38.    At all relevant times, Frontier maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

39.    At all relevant times, Frontier was an "employer" within the meaning of all relevant statutes and regulations.

## FACTS

### A.    Background

40.    Frontier provides a range of telecommunications and technology services, including high-speed fiber internet, video, voice, and additional network solutions for residential, business, and wholesale customers in Florida and across the United States.

41.    Frontier enters into agreements with companies who provide Frontier with Technicians who perform installation, maintenance, and repair work in connection with cable, telephone, and internet services provided to Frontier's customers.

42.     CS provides Technicians to telecommunications companies, enabling the telecommunications companies to deliver services to their customers.

43.     In or around 2022, Frontier and CS entered into an agreement for CS to provide Technicians to Frontier to perform services for their customers.

44.     Upon information and belief, around the same time Frontier and CS entered into the agreement for CS to provide Frontier with Technicians, Sunderland and Cristobal entered into a separate agreement to provide project and vendor management services to Frontier.

45.     Specifically, Sunderland and Cristobal agreed to oversee, supervise, and manage all Technicians Frontier hired through companies such as CS and Gridsource, Inc.

46.     Sunderland and Cristobal provide project and vendor management services to Frontier under the trade name Drive Management Group, which they established on or around September 2, 2022.

47.     Also, in 2022, CS rebranded and began doing business under the trade name Conexa Technologies.

**B.    Joint Employment and Indicia of Control**

48.     Defendants function as a single integrated enterprise that together provide telecommunications and technology services to Frontier's customers throughout Florida and across the country.

49.     Defendants supervise and control all aspects of the employment of workers who perform installations, maintenance, repairs, and other work in connection with cable, telephone, and internet services provided to residential, commercial, and wholesale customers of Frontier.

50.     By way of example only, after Frontier hires a Technician through Conexa, Defendants determine the geographic region that the Technician will provide services to Frontier's customers.

51.     If a Technician wants to be transferred to a different geographic region, then the Technician must submit a transfer request to Conexa which has to be approved or denied by Defendants.

52.     Also, Defendants require Technicians to follow certain polices and procedures related to their job duties which include, *inter alia*, running cables, setting up equipment such as modems, routers, optical network terminals, fiberoptic drops, and set-top boxes, and ensuring that all connections are properly configured.

53.     Defendants set the work schedules for all Technicians, including the start and end time of each shift, as well as a myriad of other conditions of employment.

54.     Defendants schedule Technicians to perform services for Frontier's customers Mondays through Saturdays.

55.     Defendants do not provide services by Technicians on Sundays.

56.    Defendants mandate that Technicians regularly work at least five days per week.

57.    During regular virtual meetings each Friday called "tailgate meetings," Defendants provide Technicians with their work schedule for the following week.

58.    Defendants also provide Technicians with online accounts to access Frontier's MTPN software.

59.    Through MTPN accounts, Defendants provide Technicians with information about their daily assignments, including the addresses of the customers they have been assigned to and the services they are required to perform for those customers.

60.    Defendants instruct Technicians to retrieve information about their daily assignments by logging into their MTPN accounts each morning they are assigned to work.

61.    Defendants also use the MTPN accounts to track Technicians' locations and the status of the work they perform for Frontier's customers.

62.    Indeed, Defendants require Technicians to indicate in their MTPN accounts when they are "en route" to a jobsite.

63.    Each workday, Defendants require Technicians to be "en route" to their first assigned jobsites by 8:00 a.m.

64.    If a Technician fails to begin his commute to his first assigned jobsite by 8:00 a.m., then an employee from Frontier or Conexa attempts to contact the Technician to determine why the he failed to start his commute on time.

65.    Defendants can and do reprimand and fire Technicians who do not timely begin their commutes to their first assigned jobsites.

66.    After a Technician arrives at a jobsite and before he begins performing work for the customer associated with the jobsite, Defendants requires the Technician to record in his MTPN account that he has arrived at the jobsite.

67.    When a Technician completes work he was assigned to provide to a customer, Defendants direct the Technician to record in his MTPN account that he finished the job.

68.    Defendants also require Technicians to write notes in their MTPN accounts about any complications or issues that may have arisen during the work they performed for a customer.

69.    Additionally, Defendants mandate that Technicians contact an employee of DMG to provide certain information about any complications or issues that arose during their work.

70.    If a Technician arrives at a jobsite and the customer is unable to accept service, then Defendants require that the Technician record the job as "suspended" in his MTPN account.

71.    After a Technician completes work for a customer or if a customer is not able to accept service at the time the Technician arrives at a jobsite, then Defendants direct the Technician to proceed to his next assigned jobsite.

72.    After a Technician completes his other daily assignments, Defendants require the Technician to return any "suspended" jobs to see if the customers associated with those jobsites are able to accept service.

73.    If a customer at a suspended jobsite is still unable to accept service when the Technician returns, then Defendants reschedule the work for that customer to be complete on a different day.

74.    Defendants also share resources, align their business strategies, and have intertwined management structures related to the supervision of work performed by Technicians.

75.    For example, Conexa maintains training facilities in Battleboro, Vermont and Connecticut that provide training to Technicians on how to perform various tasks related to cable, telephone, and internet services provided to residential and commercial customers of Frontier.

76.    Conexa also provides training to Technicians who perform services for Frontier's customers during virtual meetings.

77.    Additionally, Defendants require Technicians to travel to Frontier's warehouses throughout Florida so that Frontier can provide them with equipment

such as modems, routers, optical network terminals, fiberoptic drops, and set-top boxes they need to perform services for Frontier's customers.

78.    Defendants maintain employment records for their employees, including timesheets, payroll reports, and wage statements.

79.    Indeed, Defendants require Technicians to submit timesheets to their supervisors at Conexa.

80.    After a Conexa supervisor signs off on the submitted timesheet, the timesheet is transferred to Conexa's payroll department for a supplemental review.

81.    Upon information and belief, if the payroll department approves the timesheet, then the timesheet is sent to Frontier for a final approval.

82.    After a timesheet is finally approved by Frontier, then Conexa provides Technicians with a document called a Payroll Report which contains information about the amount of compensation to be paid to a Technician in connection with a specific pay period.

83.    Further, upon information and belief, DMG has access to Frontier's MTPN software and has the ability to program the software so that jobs for Frontier's customers are assigned to Technicians based on the Technicians' assigned location(s) and work experience.

C.    **David Russell**

    i.    Background

84.    In 2020, Russell joined CS.

85.    In February 2023, through Conexa (formerly CS), Frontier hired Russell to work as a Technician and provide services to its customers in Saint Petersburg and Seminole, Florida.

86.    As a Technician for Frontier, Russell was responsible for installing, maintaining, and repairing cable, telephone, and internet services at residential and commercial properties of Frontier's customers.

87.    Russell's job duties included, *inter alia*, running cables, setting up equipment such as modems, routers, optical network terminals, fiberoptic drops, and set-top boxes, and ensuring that all connections are properly configured.

88.    To complete jobs for customers, Frontier required Russell to travel to its warehouse in Tampa, Florida at the beginning of each workweek so that Frontier could provide him with the above-referenced equipment.

89.    Throughout his employment, Conexa and Frontier exerted significant control over Russell.

90.    Indeed, Conexa and Frontier controlled the work schedule for Russell and other Technicians.

91.    Conexa and Frontier mandated that Russell and other Technicians work at least five days a week.

92.    Since Conexa and Frontier do not provide Technician services to Frontier's customers on Sundays, Russell and other Technicians typically worked Monday through Saturday with Conexa and Frontier providing them with one additional regular day off from work during the week.

93.    Each workday, CS and Frontier required Russell to log into an account provided to him by Frontier so that he could access Frontier's MTPN software to receive his daily assignments.

94.    Through its MTPN software, Frontier provided Russell with information about the customers he was assigned to and the types of jobs he was required to complete for those customers.

95.    Frontier also tracked Russell's daily hours worked by having him log in and out of its MTPN software at the start and end of each shift.

96.    Additionally, Conexa and Frontier used Frontier's MTPN software to track Russell's location throughout each workday.

97.    At the beginning of each workday, Conexa and Frontier required Russell to log into the MTPN software before 8:00 a.m.

98.    After logging into the MTPN software and retrieving information about the customers and jobs Frontier assigned to him to that day, Conexa and Frontier

directed Russell to begin his commute to his first assigned jobsite early enough so that he would arrive at the jobsite by 8:00 a.m.

99.    If Russell failed to report to his first assigned jobsite by 8:00 a.m., then a Conexa or Frontier employee would contact Russell and reprimand him.

100.    If a Technician such as Russell consistently failed to arrive at his first assigned jobsites by 8:00 a.m., then Conexa and Frontier could terminate his employment.

101.    After Russell arrived at a jobsite and if the customer was able to accept service, Conexa and Frontier required Russell to log into the MTPN software using his mobile phone and record that he had started his assigned work for that customer.

102.    After completing a job, Conexa and Frontier required Russell to mark the job completed in the MTPN software and write notes about any complications that may have arisen while he was working.

103.    If the customer was unable to accept service at the time Russell arrived at a jobsite, then Conexa and Frontier directed Russell to log the job as "suspended" in the MTPN software.

104.    CS and Frontier then instructed Russell to proceed to his next assigned jobsite.

105.    Conexa and Frontier required Russell to return to any jobsite where work was "suspended" after completing his other daily assignments.

106.   If after returning to a suspended job the customer was still unable to accept service, then the job would be rescheduled for a different day.

ii.   <u>Russell is Granted and Excels Working with a Reasonable Accommodation Related to His Type 2 Diabetes</u>

107.   Russell was diagnosed with Type 2 diabetes by his physicians at the United States Department of Veteran Affairs (the, "VA") in or around 2017.

108.   Russell's diabetes substantially limits one or more major life activities, including sleeping, concentrating, interacting with others, and working.

109.   Russell's diabetes also substantially limits one or more major bodily functions, including, *inter alia*, his endocrine system, which regulates insulin and blood sugar levels.

110.   As such, Russell's diabetes amounts to a disability.

111.   When Russell was first diagnosed with diabetes, Russell's physicians at the VA directed him to, *inter alia*, avoid overexerting himself and get sufficient rest in order to adequately manage the symptoms of his diabetes.

112.   In 2020, CS and Consolidated Communications ("Consolidated"), a company that provides high-speed internet, phone, and streaming TV services for residential customers, along with data, voice, and cloud solutions for businesses, hired Russell to work as a Technician to perform services for Consolidated's customers.

113.    Soon after he started working for Consolidated, Russell disclosed his diabetes diagnoses to CS's Managing Partners, Benjamin Sunderland and Keith Cristobal.

114.    However, Russell did not require an accommodation while working for Consolidated because he was regularly provided with two consecutive days off per week throughout his employment.

115.    Consecutive days off from work allows individuals with diabetes to focus on rest and recovery, which helps in maintaining stable blood glucose levels.

116.    After being hired by Frontier in February 2023, Conexa and Frontier assigned Russell to work five days a week with no consecutive days off.

117.    As a result of his diabetes and not having consecutive days off from work, Russell began to experience extreme fatigue in or around March 2023.

118.    Indeed, Russell often experienced server exhaustion during and after work assigned to him by Conexa and Frontier which impacted his ability to drive safely from jobsite to jobsite.

119.    As a result, during a regular work call with Greg Ellis ("G. Ellis"), a manager at Conexa and Russell's supervisor at that time, Russell requested two consecutive days off of work each week so that he could recover from the fatigue caused by his diabetes.

120.   Since Conexa and Frontier already provided all Technicians off from work on Sundays, G. Ellis granted Russell off from work each Monday as an accommodation so that he could have two consecutive days off to manage the symptoms of his diabetes.

121.   For almost a year, Russell thrived working with his reasonable accommodation and was regularly commended for his hard work and dedication.

## I.   Conexa and Frontier Unlawfully Rescind Russell's Reasonable Accommodation and Terminate His Employment

122.   Each Friday, Conexa and Frontier require Technicians to attend virtual "tailgate" meetings during which Technicians are provided with their schedules for the following week and other relevant information.

123.   During a tailgate meeting in late-Spring 2023, Ryan Nemmers ("Nemmers"), the Director of Operations for Conexa, announced that Frontier was requiring all Technicians to regularly work six days per week and that Technicians would only regularly receive off from work on Sundays.

124.   Of course, Russell was concerned about Frontier's mandate because he required and had been provided an accommodation to regularly have off from work two consecutive days per week to manage the symptoms of his diabetes.

125.   After the tailgate meeting, Russell called Nemmers and explained that G. Ellis had granted him an accommodation so that he could regularly have off on Sundays and Mondays to manage the symptoms of his diabetes.

19

126.   In response, Nemmers admitted that Frontier had in fact not issued a mandate requiring Technicians to work six days per week and that Conexa had lied to Technicians to force them to work an additional day per week to generate more revenue for Conexa.

127.   The call between Russell and Nemmers ended soon thereafter, and Russell continued to receive his previously approved accommodation.

128.   Around February 2024, G. Ellis accepted a manager position outside of Florida and Conexa hired John Simmons ("Simmons") to replace G. Ellis.

129.   During a weekly tailgate meeting in late-February 2024 after Simmons had taken over for G. Ellis, Simmons claimed that Frontier issued a directive requiring Technicians to regularly work on Mondays because there is typically a high demand for Technician work on Mondays.

130.   Simmons then relayed a threat that Conexa and Frontier would fire Technicians if they could not commit to regularly working on Mondays.

131.   At the end of the meeting, Russell was provided with his schedule for the following week which did not provide for two consecutive days off.

132.   Indeed, on February 21, 2024, Katy Davenport, a Senior Operations Specialist at Frontier, sent an email directing that Russell no longer be provided off on Mondays.

133.    Immediately after the above-referenced tailgate meeting, Russell called Nemmers and told him that Conexa and Frontier had not provided him off from work on the upcoming Sunday and Monday per his reasonable accommodation.

134.    Nemmers repeated Frontier's alleged mandate that Technicians could no longer regularly have off on Mondays.

135.    Nemmers then stated that Russell could file a request to continue under his previously approved accommodation with Frontier and that he could have the next Monday off from work while a decision on his request was pending.

136.    On February 29, 2024, Christina Adams ("Adams"), a Senior Manager in Operations at Frontier, sent an email concerning Russell's accommodation to employees of DMG, a professional services firm that provides strategic management consulting services to Conexa and Frontier.

137.    In her email, Adams stated, without providing any explanation or justification whatsoever, "We are unable to accommodate this request."

138.    Joshua Stombaugh ("Stombaugh"), the Director of Operations at DMG, then sent an email to Simmons and Nemmers later that day informing them of Frontier's decision not to allow Russell to continue working with his previously approved accommodation.

139.    On March 10, 2024, Nemmers sent Russell a message through Telegram Messenger in which he asked Russell to obtain a letter from his doctor

related to his request to continue under his previously approved accommodation and Russell provided the letter soon thereafter.

140.    Even though Russell provided the letter Nemmers requested, Nemmers informed Russell during a telephone call shortly thereafter that Conexa and Frontier had denied his request.

141.    Nemmers also told Russell that he had scheduled a Teams video meeting with Charlene Ellis ("C. Ellis"), a Human Resources employee at Conexa, so the three of them could discuss Conexa and Frontier's decision to rescind his reasonable accommodation.

142.    A few days later, Russell, Nemmers, and C. Ellis participated in the Teams video meeting.

143.    During the meeting, Nemmers reiterated Conexa and Frontier's decision to deny his request to continue under his previously approved accommodation and stated that he could no longer regularly have off on Mondays.

144.    Nemmers then offered Russell a position working in one of Conexa's warehouses and stated he could have off on Saturdays and Sundays in that role.

145.    However, Nemmers did not offer any explanation for why Russell could not continue to work with the accommodation that he had for over a year or why he could not have two consecutive days off working as a Technician.

146.   Also, the warehouse position offered to Russell paid only $800 per week, substantially less than Russell earned as a Technician.

147.   When Russell explained that he could not take such a dramatic pay cut, Nemmers callously told Russell that he could accept the warehouse position or quit.

148.   The meeting then ended and CS and Frontier fired Russell on April 5, 2024.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF THE ADA: DISCRIMINATION
(*Against All Defendants*)

149.   Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

150.   During the full statutory period, Plaintiff was protected by the provisions of the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

151.   During the full statutory period, ACS and the City were subject to the provisions of the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

152.   As set forth above, Defendants discriminated against Plaintiff on the basis of his disabilities in violation of the ADA, by, *inter alia*, denying him equal terms and conditions of employment because of his disabilities, rescinding his

reasonable accommodations and refusing to reinstate same, and failing to engage in an interactive process.

153.   Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the ADA.

154.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

155.   Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE FCRA: DISCRIMINATION
(*Against All Defendants*)

156.   Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

157.   During the full statutory period, Plaintiff was protected by the provisions of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.*, and all applicable regulations thereunder.

158.   During the full statutory period, Defendants were subject to the provisions of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.*, and all applicable regulations thereunder.

159.   As set forth above, Defendants discriminated against Plaintiff on the basis of her disabilities in violation of the FCRA, by, *inter alia*, denying him equal terms and conditions of employment because of his disabilities, rescinding his reasonable accommodations and refusing to reinstate same, and failing to engage in an interactive process.

160.   Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the FCRA.

161.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the FCRA, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

162.   Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself, respectfully requests that this Court:

A.     Declare that the practices complained of herein are unlawful under applicable federal and State law;

B.     Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     Grant Plaintiff an award of damages, in an amount to be determined after a trial, to compensate him for all non-monetary and/or compensatory damages he has suffered, including, *inter alia*, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

D.     Grant Plaintiff an award of damages, in an amount to be determined after a trial, for any and all other monetary and/or non-monetary losses he has suffered;

E.     Grant Plaintiff reinstatement;

F.     Grant Plaintiff an award of prejudgment interest on the damages he is awarded to the greatest extent permitted by law;

G.     Grant Plaintiff an award of punitive damages in an amount to be determined after a trial;

H.    Grant Plaintiff an award of costs and reasonable attorneys' fees incurred in this action to the greatest extent permitted by law;

I.    Grant Plaintiff such other and further relief that the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: January 14, 2025          **CRABILL PLLC**
    Lakewood Ranch, Florida

By: _____
          Taylor J. Crabill

71-01 Austin Street
Forest Hills, New York 11375
Tel: (727) 335-1030
tcrabill@crabilllawfirm.com

*Attorney and Lead Counsel for Plaintiff*